United States District Court
District of Massachusetts

| | |
|---|---|
| ALYSSA WITTKOWSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 14-11107-NMG |
| STEPHEN LEVINE, ROBERT DEINER, | ) |
| JOEL ANDRADE, NEAL NORCLIFFE and | ) |
| THOMAS GROBLEWSKI, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case involves Section 1983 civil rights claims brought by Alyssa Wittkowski ("Wittkowski" or "plaintiff"), an inmate of the Massachusetts Department of Correction ("the DOC"), against various doctors who are under contract with the Commonwealth to provide services to its inmates. Wittkowski is a transgender woman who sought but was denied sex reassignment surgery ("SRS") by doctors on the DOC's Gender Dysphoria Treatment Committee ("GD Treatment Committee"). That committee is composed of a group of doctors tasked with supervising and approving treatments with respect to patients suffering from gender dysphoria ("GD") (previously referred to as "Gender Identity Disorder"). Plaintiff now claims that the doctors' refusal to provide her SRS constitutes deliberate indifference to her

-1-

serious medical needs in violation of her rights under the Eighth and Fourteenth Amendments. She also brings claims for medical malpractice against those same doctors under Massachusetts law.

Before the Court are the defendant doctors' motions for summary judgment (Docket No. 200 and 201) and plaintiff's motion for funds to hire an expert witness (Docket No. 224). For the reasons that follow, defendants' motions will be allowed and plaintiff's motion will be denied as moot.

I. **Background**

   A. **The Parties**

Alyssa Wittkowski is an inmate currently incarcerated at Old Colony Correctional Center ("OCCC") located in Bridgewater, Massachusetts. She has been incarcerated since 2005.

The defendants are five doctors who directly or indirectly participated in the treatment of Wittkowski. Drs. Joel Andrade, Robert Diener, Thomas Groblewski and Neal Norcliffe are members of the Massachusetts Partnership for Correctional Healthcare ("MPCH") which is under contract with the DOC to provide certain medical and mental health services to inmates who reside with the DOC. That contract terminated in June, 2018. Those same doctors were also members of the GD Treatment Committee at various times between July, 2013, and June, 2018. Under DOC policy, each inmate suffering from GD is assigned a primary care

clinician ("PCC") responsible for case management and direct treatment and the GD Treatment Committee reviews the PCC's treatment plans to ensure that all recommendations are clinically appropriate.

Dr. Stephen Levine is a licensed psychiatrist who was a contractor hired to provide services to the MPCH. As part of his duties, he consulted with the defendants on the GD Treatment Committee regarding the treatment of individuals suffering from GD, which included a brief discussion about plaintiff. Dr. Levine did not, however, personally communicate with or examine Wittkowski in any way nor did he author any report with respect to plaintiff.

**B. GD Treatment**

Wittkowski was treated by a psychiatrist for bipolar disorder from the 1990s until 2005 when she was first incarcerated. She first reported experiencing symptoms of GD to her mental health clinician in July, 2010, but was denied treatment for that disorder. In December, 2011, she was transferred from MCI-Norfolk to OCCC after having sex with another inmate. In August, 2012, she was diagnosed with GD.

In September, 2012, Wittkowski met with her new PCC, Vanessa Martino-Fleming. Plaintiff alleges that she expressed to her PCC at that time that she had thoughts of self-mutilation, castration and suicide, while defendants assert that

-3-

she "denied suicidal ideations, did not have a plan to self-mutilate, and was future oriented". Later that month, Wittkowski requested electrolysis and hormone replacement therapy ("HRT") for the first time. In March, 2013, the GD Treatment Committee discussed the request for HRT and determined that a continued period of observation and psychotherapy was appropriate.

In July, 2014, the GD Treatment Committee discussed Wittkowski's feminization and her frustration at not receiving HRT. The GD Treatment Committee decided to continue its ongoing review of HRT for plaintiff while she continued her therapy with her PCC. In October, 2014, the GD Treatment Committee approved HRT for Wittkowski and referred her to an endocrinologist. In January, 2015, she began HRT.

In August, 2015, Wittkowski informed her PCC that she wanted SRS. Later that month, the GD Treatment Committee discussed her request but did not approve it. In October, 2015, the GD Treatment Committee approved facial hair removal to help alleviate Wittkowski's dysphoria. In November, 2016, the GD Treatment Committee approved electrolysis for continued hair removal treatment.

Defendants assert that Wittkowski consistently denied suicidal ideations and thoughts of self-injury from the time she was transferred to OCCC until April, 2017. At that time,

defendants submit that she first began expressing fleeting suicidal thoughts. Wittkowski maintains, however, that she has consistently made suicidal statements and expressed her desire to self-mutilate during all relevant times.

In July, 2017, the GD Treatment Committee again considered Wittkowski's request for SRS and noted that there had been some increase in her suicidal ideations but that she was ambivalent about taking anti-depressants. Discussions with respect to Wittkowski's request continued into late 2017 but the GD Treatment Committee persisted in denying such surgery.

In the opinion of Dr. Andrade, the Chair of the GD Treatment Committee, Wittkowski was at all relevant times receiving care for her GD that was consistent with the accepted standards of care promulgated by the World Professional Association for Transgender Health. Wittkowski presently has access to bras, sports bras, feminine underwear and feminine t-shirts, as well as cosmetic items such as lipstick, eyebrow pencil, hairspray and hair rollers. She also participates in monthly therapy sessions with her PCC. Furthermore, she has been receiving HRT, electrolysis and laser hair removal for several years. As of June, 2018, it was the opinion of the GD Treatment Committee that SRS is not medically necessary for plaintiff.

### C. Procedural History

In March, 2014, plaintiff filed her initial complaint in this Court against the defendant doctors, as well as the DOC Commissioner and others, asserting federal civil rights claims under 42 U.S.C. § 1983 and medical malpractice under Massachusetts law. She also requested HRT. The DOC Commissioner and other parties were later dismissed from this case. In September, 2015, after filing and being denied a grievance related to her request for SRS, plaintiff filed an amended complaint seeking HRT, electrolysis, SRS and compensatory damages. Wittkowski concedes that she has since received both HRT and electrolysis and thus her only remaining claims are for an affirmative injunction ordering SRS and compensatory damages for inadequate medical care.

In her amended complaint, Wittkowski alleges that defendants were deliberately indifferent to her serious medical needs when they denied her SRS and thus they violated her right to adequate medical treatment under the Eighth and Fourteenth Amendments. In September, 2018, defendants filed motions for summary judgment, asserting that they are entitled to judgment as a matter of law because 1) plaintiff's claims for injunctive relief are moot, 2) she failed to exhaust her administrative remedies, 3) she received adequate medical treatment under the applicable Eighth Amendment standard, 4) defendants are entitled

to qualified immunity on the damages claims and 5) plaintiff has proffered no medical expert to establish the applicable standard of care and thus cannot prevail on her medical malpractice claims. Apparently in response to that last assertion, Wittkowski filed a motion for funds to retain an expert in November, 2018.

**II. Motions for Summary Judgment**

    **A. Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

**B. Section 1983 Claims**

Section 1983 of Title 42 of the United States Code provides that a person acting under the color of state law is liable for money damages or injunctive relief where he or she deprives another citizen of "any rights, privileges, or immunities secured by the Constitution and laws". Private parties performing functions that are inherently governmental in nature are amenable to suit under Section 1983. Frazier v. Bailey, 957 F.2d 920, 928 (1st Cir. 1992). To succeed on her Section 1983 claims, Wittkowski must prove an underlying violation of her constitutional rights.

### 1. Eighth Amendment: Deliberate Indifference to Serious Medical Need

Under the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment, a state has an obligation to provide adequate medical care to its inmates. Estelle v. Gamble, 429 U.S. 97, 103 (1976).  To establish a claim under the Eighth Amendment for inadequate medical care, the plaintiff must demonstrate 1) that she has a serious medical need and 2) that the defendants were deliberately indifferent to that serious medical need. Id. at 104; Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991).  The serious medical need prong involves an objective standard while the deliberate indifference prong involves a subjective standard. Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).

A medical need is serious it there is a substantial risk of serious harm if not adequately treated or

> if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Id. (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)).  The Eighth Amendment does not, however, require prison officials to provide the most sophisticated care or the care of the prisoner's choosing so long as it is not "so inadequate as to shock the conscience". Id. at 82-83 (quoting Torraco, 923 F.2d at 235); id. at 90 ("The

law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to second guess medical judgments or to require that the DOC adopt the more compassionate of two adequate options." (internal quotation marks omitted)).

Deliberate indifference requires more than simple negligence or medical malpractice. Estelle, 429 U.S. at 105-06. Rather, the plaintiff must show that the prison official was aware that a substantial risk of serious harm existed and that the official nevertheless disregarded that substantial risk of harm. Farmer v. Brennan, 511 U.S. 825, 837 (1994); see also Kosilek, 774 F.3d at 83 (stating that deliberate indifference "requires evidence that the failure in treatment was purposeful" (citing Estelle, 429 U.S. at 105)). That is the same standard used for criminal recklessness. Farmer, 511 U.S. at 839-40. A mere disagreement between a prisoner and the treating doctors about the proper course of medical treatment does not give rise to a constitutional violation under the Eighth Amendment. Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993). Where an inmate exhibits suicidal tendencies, the defendants must have been aware of a "strong likelihood, rather than a mere possibility, that self-infliction of harm [would] occur" in order to find them deliberately indifferent. Torraco, 923 F.2d at 236.

The First Circuit Court of Appeals' decision in Kosilek is particularly apposite here. In that case, the First Circuit held that the DOC's decision not to provide SRS to an inmate with GD did not constitute inadequate medical care in violation of the Eighth Amendment. See Kosilek, 774 F.3d at 68.

With respect to the objective prong, the First Circuit found that, on the particular facts of the case, there was no serious medical need for SRS because prison officials had provided the inmate a host of other ameliorative measures, including HRT, hair removal, feminine clothing and accessories and access to regular mental health treatment, which had significantly stabilized her mental condition. Id. at 89-90. Given that course of treatment, the Court concluded that the inmate's care was not inadequate.

Furthermore, the Court explained that the DOC's chosen course of treatment "d[id] not wantonly disregard [the inmate's] needs, but account[ed] for them". Id. at 90. Even though there was disagreement between medical professionals as to whether SRS was a medically necessary treatment for that inmate, the First Circuit held that choosing between two alternative but adequate treatments did not exhibit the sort of deliberate indifference to the inmate's serious medical needs required for a claim under the Eighth Amendment. See id. at 91-92.

**2. Application**

Defendants argue that, because they are the functional equivalent of public officials, they are entitled to qualified immunity and thus cannot be held liable for damages. See Frazier, 957 F.2d at 928-29. While the Court agrees that the doctrine of qualified immunity applies to defendants, see Husband v. Fair, Civ. A. No. 86-2865-Z, 1993 WL 343669, at *6 (D. Mass. Aug. 30, 1993) (holding that doctors under contract with Massachusetts to provide medical services to inmates were entitled to qualified immunity because they fulfilled the Commonwealth's duty to provide adequate medical care), it is unnecessary for it to analyze their conduct under that doctrine. The Court concludes that there was simply no violation of Wittkowski's constitutional rights under the Eighth and Fourteenth Amendments and thus her Section 1983 claims for both injunctive relief and damages are unavailing.[1]

**a. Serious Medical Need**

Just as the First Circuit determined in Kosilek, the Court finds here that the GD Treatment Committee's refusal to approve Wittkowski's request for SRS did not render her medical care

---

[1] Defendants also submit that 1) plaintiff failed to exhaust her administrative remedies and 2) her claim for injunctive relief is moot because defendants are no longer under contract with the DOC and thus no longer control Wittkowski's medical treatment. Because the Court concludes that there was no underlying constitutional violation, it declines to address those additional defenses.

constitutionally inadequate. Starting in 2015, Wittkowski began receiving HRT and in 2016 she was approved for electrolysis. She has continued to receive both forms of treatment for her GD since that time, as well as sustained mental health treatment through therapy and medication.

This is not a situation where a physician has determined a particular treatment to be medically necessary nor is the chosen treatment plan so lacking that even a lay person would recognize that more is required. Rather, the doctors here, just as in Kosilek, have provided a substantial amount of medical care to Wittkowski, including HRT, electrolysis and mental health treatment and access to women's clothing and cosmetics, which seems to have ameliorated at least some of her mental health issues. See Kosilek, 774 F.3d at 89-90. The treatment she has been provided is not, therefore, "so inadequate as to shock the conscience". See Torraco, 923 F.2d at 235. The mere fact that defendants did not provide Wittkowski's preferred treatment does not render her care constitutionally inadequate under the Eighth Amendment. See Kosilek, 774 F.3d at 82-83, 90.

### b. Deliberate Indifference

The Court also concludes that defendants were not deliberately indifferent to Wittkowski's medical needs. Far from disregarding her requests for medical treatment, the doctors on the GD Treatment Committee considered Wittkowski's

ongoing treatment on numerous occasions from at least 2013 through June, 2018, and approved substantial forms of treatment during that time, including HRT and electrolysis. Just because plaintiff disagrees with those doctors about the approved course of treatment does not mean that they were deliberately indifferent to her medical needs. See Watson, 984 F.2d at 540.

Wittkowski submits that due to defendants' failure to provide SRS, she is at a substantial risk of committing self-mutilation or suicide. While awareness of a substantial risk of self-harm can support a finding of deliberate indifference, there is insufficient evidence to demonstrate that defendants were aware of such a risk in this case.

There is a dispute between the parties with respect to how frequent and extensive Wittkowski's expressions of suicidal ideation and self-mutilation were during the relevant time period. Plaintiff asserts in her Amended Complaint and affidavit that she frequently and consistently expressed thoughts of suicide and self-mutilation to her PCC and other health professionals. Defendants respond by providing medical and mental health treatment records which indicate that she denied suicidal thoughts or plans to self-harm and plaintiff does not appear to have a history of such inimical conduct.

Although there appears to be a factual dispute on this issue, the dispute is immaterial. Given that the doctors on the

GD Treatment Committee made their medical decisions based on Wittkowski's medical treatment records and those records do not indicate that she presented a serious risk of suicide or self-mutilation, there is insufficient evidence from which a jury could find that defendants were deliberately indifferent to a serious risk of self-harm. Even if plaintiff has subjectively experienced thoughts of suicide or self-mutilation, those thoughts are irrelevant insofar as they were not made known to defendants when they made their medical decisions. While defendants may have been aware of a <u>possibility</u> of self-harm based on the treatment notes submitted to them, there is no evidence that they discerned a <u>strong likelihood</u> of such harm based on what those records reflected. See <u>Torraco</u>, 923 F.2d at 236.

Because the Court finds that defendants did not act in deliberate indifference to a serious medical need, defendants' motions for summary judgment will be allowed with respect to plaintiff's Section 1983 claims.

### C. Medical Malpractice Claims

To succeed on a claim of medical malpractice under Massachusetts law,

> a plaintiff must establish the applicable standard of care and demonstrate both that a defendant physician breached that standard, and that this breach caused the patient's harm.

Palandian v. Foster, 842 N.E.2d 916, 920 (Mass. 2006). Furthermore, the plaintiff must typically proffer expert testimony to establish the applicable standard of care. Id. at 921; see also Racowsky v. Burke, 983 N.E.2d 749 (Mass. App. Ct. 2013) (holding that where plaintiff presented no expert testimony concerning the applicable standard of care, there was insufficient evidence from which a reasonable jury could conclude that the defendant had committed medical malpractice).

Wittkowski has not proffered an expert witness to establish the applicable standard of care nor has she presented any other evidence beyond her own pleadings establishing that defendants provided deficient medical care. Rather, as discussed above, defendants have demonstrated that they provided adequate medical care to Wittkowski in treating her GD. Because defendants satisfied their initial burden on summary judgment, the burden has shifted to plaintiff to set forth specific facts showing that there is a genuine issue of material fact. See Celotex, 477 U.S. at 324.

Plaintiff has not met that burden. While she now seeks funds to hire an expert, Wittkowski does not explain what her purported expert would testify to or how such testimony would establish her claims for medical malpractice. Moreover, plaintiff's motion for funds to hire an expert is untimely. The Court has granted the parties numerous extensions to designate

experts since 2017 and never before has Wittkowski sought funds to retain such an expert. Most recently, plaintiff was required to designate her expert witnesses by late January, 2018, which she failed to do.

Accordingly, defendants' motions for summary judgment will be allowed with respect to plaintiff's claims for medical malpractice and plaintiff's motion for funds to hire an expert witness will be denied as moot.

### ORDER

For the foregoing reasons,

1) the summary judgment motion of defendant Levine (Docket No. 200) is **ALLOWED;**

2) the summary judgment motion of defendants Andrade, Diener, Groblewski and Norcliffe (Docket No. 201) is **ALLOWED;** and

3) plaintiff's motion for funds to hire an expert witness (Docket No. 224) is **DENIED** as moot.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 8, 2019